United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 9, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————————————————

No. 02-31175

————————————————

SANDRA SMITH,

Plaintiff - Appellant

v.

AT&T SOLUTIONS, INC., d/b/a AMERICAN TELEPHONE & TELEGRAPH CO.,

Defendant - Appellee

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
No. 01-CV-2798

_____

Before KING, Chief Judge, DENNIS, Circuit Judge, and LYNN,[*]
District Judge.

PER CURIAM:[**]

Appellant Sandra Smith appeals the district court's grant of

summary judgment in favor of Appellee AT&T Solutions, Inc. on her

claims of retaliation under the Louisiana whistleblower statute,

LA. REV. STAT. ANN. § 23:967 (West 2003). Finding no error, we

affirm.

———————————————

[*] District Judge for the Northern District of Texas, sitting
by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

1

## I. FACTS AND PROCEEDINGS

AT&T Solutions, Inc. ("AT&T")[1] entered into a contract with McDermott International to manage McDermott's information technology organization (the "McDermott Project"). AT&T employees were to work in McDermott's offices in New Orleans and AT&T agreed to pay McDermott an annual fixed amount for office space, phone services, and utilities. Appellant Sandra Smith had been a supervisor for daily adjustments at AT&T Corporation, working under the supervision of Sandi Michel. When Michel moved to the McDermott Project as the human resources manager, she offered Smith a position as the Project's sole training supervisor. Smith accepted, and began working in her new capacity in 1999. From time to time, in addition to her training responsibilities, Michel gave Smith other human resources work.

Soon after starting her new position, Smith apparently became concerned that she was being required to perform an excessive amount of work. She expressed her concern to Tom Tierney, the AT&T manager in charge of the McDermott Project, and to other AT&T employees involved with the Project. Eventually, Smith raised her concern with Michel. In September or October of 1999, Smith requested to Michel that her position be reevaluated

---

[1] AT&T Solutions, Inc. is a subsidiary of AT&T Corporation.

2

in light of her workload, so she could receive a promotion.[2]

Smith's request for reevaluation was documented in an email to Michel dated May 11, 2000. On May 12, 2000, Michel forwarded Smith's email, along with Michel's recommendation that Smith be given a promotion, to the offices of AT&T Corporation in New Jersey.

Between October 1999 and May 2000, Smith had become aware that two of her co-workers, Holly Pape (a temporary employee) and Kenneth McBarron (a full-time AT&T employee), were making personal long-distance telephone calls using the AT&T access code for the McDermott account. Smith believed these calls were being charged to McDermott. In April or May of 2000, Smith asked Brad Herriage, AT&T's controller, if the calls were being billed to McDermott, which she believed would constitute theft. Smith claims Herriage told her that the calls were being billed to McDermott and that theft had therefore occurred. Herriage explained in a deposition that the calls did not constitute theft because AT&T paid McDermott a flat rate for facilities and services, including long-distance service. McDermott was not billed for individual long-distance calls. Herriage denies telling Smith it was illegal for an AT&T employee on the McDermott Project to make personal telephone calls.

---

[2] Smith's position as training supervisor was evaluated as an A-4 position. Plaintiff sought to have her position reevaluated to a reflect a grade of A-5 or higher.

Smith did not discuss the calls with Pape or McBarron. However, Smith claims she reported the telephone calls to Michel several times, and that Michel told her she would report the calls to Adrian Lee, AT&T's business manager on the McDermott Project. Smith claims she once reported the calls directly to Lee, who said he would have a report run on long-distance usage at McDermott.

In mid-April of 2000, Smith reported McBarron's and Pape's telephone calls to AT&T Corporation's Corporate Security Department. On June 29, 2000, Andrea Wade, a Security Department employee, conducted an internal investigation. She interviewed McBarron, Pape, Evelyn Demoruelle (another employee who reported telephone misuse), Herriage, Lee, Michel, Tierney, and Ken Konningsor (AT&T's Chief Financial Officer). Wade reported the results of her investigation, leaving the decision of whether to discipline McBarron and Pape to Lee, Tierney, and Michel. Thereafter, Pape's temporary agency was informed that her services were no longer required by AT&T, and Michel and Lee formally reprimanded McBarron and instructed him to stop making personal phone calls.

Smith claims Wade's investigation made Michel and Lee angry because it undermined their authority and made them look irresponsible. Smith acknowledges she does not know whether Michel or Lee knew she was the employee who prompted the investigation by contacting Corporate Security. However, Smith

4

asserts that Michel and Lee could deduce that she had done so. Michel and Lee avow they were unaware until the filing of Smith's lawsuit that Smith had contacted Corporate Security. Michel and Lee were never reprimanded or otherwise criticized by AT&T for how they handled McBarron's and Pape's telephone usage. Nonetheless, Smith contends that Michel and Lee began harassing her because of her report to Corporate Security.

Smith claims that, in July of 2000, she met with Lee about her job reevaluation, and that he refused to give her the promotion she had requested. Smith also claims that in the same month, she asked Michel to review her job reevaluation, but that Michel refused, and that Michel refused her a promotion. However, later in July 2000, Smith was promoted to the A-5 level, retroactive to May 2000, when Michel had forwarded Smith's request to AT&T Corporation with her positive recommendation. Tierney testified that it was difficult to get promotions finalized in the summer of 2000 due to a hiring freeze at AT&T.

Smith also complains that soon after she was promoted, she volunteered to assist two co-workers in planning an off-premises party. She contends that Michel sent out an email, accessible to managers, stating that Smith could not assist with the party because of her inability to handle her workload.

In August 2000, AT&T executives, including Tierney, met with McDermott about the Project. Neither Lee nor Michel were present. McDermott expressed its intention to transfer several

5

functions in-house, including training, human resources, procurement, and program management. As a result of McDermott's decision, AT&T planned to give Forced Management Plans("FMPs") to employees whose positions with AT&T would be terminated when their functions were transferred to McDermott.[3] Smith's and Michel's positions were to be terminated. Tierney received permission from AT&T to distribute the FMPs over a period of time, rather than to notify the affected employees immediately. Also during August, Michel conducted a favorable mid-year performance evaluation of Smith.

On August 23, 2000, Smith contacted the Equal Employment Opportunity Department of AT&T to complain about her treatment by Michel and Lee. That Department advised Smith that her complaint did not involve issues of discrimination or retaliation.

Smith contends that in mid-September of 2000, allegedly angered by Smith's complaint to Tierney about Michel's and Lee's treatment, Michel and Lee informed her that she had thirty days to find another job, or she would be discharged. Smith claims that in late September, Konningsor told her he noticed a change in Michel's and Lee's behavior towards Smith following her report

---

[3] When an employee receives a FMP, the employee has a designated time frame, between thirty and sixty days, to look for alternative employment within AT&T. When the time period expires, the employee's position is terminated, and the employee is let go, unless he or she had been able to locate other AT&T employment.

to Corporate Security.  Smith also claims that on September 26, Lee informed her that her job was being decentralized and that she had until the end of December 2000 to find alternative employment within AT&T.

Michel scheduled a meeting with Smith for September 27, 2000.  Smith claims she left work that day and did not attend the meeting because she was afraid that Michel was going to harm her, and contends she sent Tierney an email to that effect.  Smith did not return to work on September 28.  Instead, she went on disability leave due to stress and depression and remained on leave for almost a year.

While Smith was on leave, she asked for a performance evaluation for the period when she was working as an A-5.  Michel completed a draft of the evaluation in November of 2000.  It contained negative comments about Smith's performance.  It was signed only by Michel, and did not include the requisite signatures needed to finalize an AT&T evaluation.  Upon receiving the draft, Tierney made several revisions to it, eliminating Michel's remarks.  Michel's draft evaluation was never made a part of Smith's personnel file.  Smith claims that Michel tried to "break into" Smith's email and voicemail accounts while she was on leave.

In December of 2000, McDermott terminated its contract with AT&T and, several employees, including Smith, were given FMPs.

In September of 2001, Smith was cleared for work by her

7

doctor, and she returned to AT&T.  Upon her return, her FMP became effective, and as a result, Smith had sixty days to find other employment within AT&T.  Smith claims that Michel impeded her ability to find other employment.  She claims Michel altered Smith's computer records to make AT&T's internal hiring managers contact Michel, rather than Smith, about positions that might be suitable for Smith.  Smith contends that Michel changed the records in order to sabotage Smith's chances of locating other work within AT&T.

Smith was unable to find alternative employment at AT&T. She contends that several of her co-workers were given extensions on their FMP periods so they could fill positions set to become available after the expiration of the sixty-day period.  Smith was not given an extension and was discharged when her FMP period expired.

On September 12, 2001, Smith filed suit against AT&T, alleging a violation of Louisiana's whistleblower statute, LA. REV. STAT. ANN. § 23:967, because Michel and Lee allegedly retaliated against Smith as a direct result of the report she made to Corporate Security about McBarron's and Pape's personal telephone calls.  Smith alleges that AT&T retaliated against her in two ways: first, by harassing her in response to her report, and second, by having her discharged as a result of her report.

AT&T filed a motion for summary judgment, which the district court granted on October 23, 2002.  Smith appeals from that

8

ruling.

## II. **STANDARD OF REVIEW**

We review a district court's grant of summary judgment <u>de novo</u>. <u>Ackel v. Nat'l Communications, Inc.</u>, 339 F.3d 376, 381 (5th Cir. 2003) (citing <u>Tango Transp. v. Healthcare Fin. Servs. LLC</u>, 332 F.3d 888, 890 (5th Cir. 2003)). Fed. R. Civ. P. 56(c) provides that "[s]ummary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In determining whether a genuine issue of fact exists, the court views the evidence in the light most favorable to the nonmovant. <u>Halls v. Gillman, Inc.</u>, 81 F.3d 35, 36-37 (5th Cir. 1996). "In the language of the Rule, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal citations, quotations, and emphasis omitted).

## III. **DISCUSSION**

Smith's Complaint is based solely on Louisiana's

9

whistleblower statute, LA. REV. STAT. ANN. § 23:967.  In pertinent part, the statute reads:

> A.  An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
> (1)  Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
> (2)  Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
> (3)  Objects to or refuses to participate in an employment act or practice that is in violation of law.

The statute states: "Reprisal includes firing, layoff, loss of benefits, or any discriminatory action the court finds was taken as a result of an action by the employee that is protected" under the statute.  Id.  § 23:967(C)(1).  An employee who suffers reprisal under the statute may bring a civil action against the employer for damages, reasonable attorneys' fees, and court costs.  Id. § 23:967(B).

Both parties agree that the appropriate framework for analyzing a retaliation claim under the Louisiana whistleblower statute is the same as that applied in Title VII retaliation cases.  While the Louisiana Supreme Court has not spoken directly on whether that framework applies to section 23:967 cases, Louisiana courts have often looked to federal anti-discrimination jurisprudence in interpreting Louisiana's anti-discrimination statutes.  See, e.g., Plummer v. Marriott Corp., 654 So.2d 843, 848 (La.App. 4 Cir. 1995); Alphonse v. Omni Hotels Mgmt. Corp., 643 So.2d 836, 838 (La.App. 4 Cir. 1994); Bennett v. Corroon and

10

Black Corp., 517 So.2d 1245, 1246-47 (La.App. 4 Cir. 1987).
Accordingly, we find that the Title VII framework is applicable
to the Louisiana statute.

In order to establish a prima facie case of retaliation
under Title VII, a plaintiff must show that (1) she engaged in
activity protected by the statute, (2) an adverse employment
action occurred, and (3) a causal link exists between the
protected activity and the adverse employment action.  Fierros v.
Texas Dep't of Health, 274 F.3d 187, 191 (5th Cir. 2001).  If a
plaintiff presents direct evidence that her employer's motivation
was at least in part retaliatory, the burden shifts to the
employer to demonstrate, by a preponderance of the evidence, that
the same decision would have been made in the absence of the
discriminatory motive.  Id. at 192.  Alternatively, if a
plaintiff presents only circumstantial evidence of causation, the
McDonnell Douglas burden-shifting framework applies.  Id. at 191.
Under the McDonnell Douglas framework, the plaintiff has the
initial burden of demonstrating a prima facie case of
retaliation.  McDonnell Douglas Corp. v. Green, 411 U.S. 792,
802, 93 S.Ct. 1817, 36 L.E.2d 668 (1973).  At this stage, the
standard for satisfying the causation element is less stringent
than "but for" causation.  Fierros, 274 F.3d at 191.  If the
plaintiff establishes a prima facie case, an inference of
retaliatory motive is created.  Id.  The employer can rebut this
inference by producing evidence of a legitimate, non-retaliatory

11

reason for the adverse employment action. Id. Once the employer produces such evidence, the burden shifts back to the plaintiff to prove that her protected activity was a "but for" cause of the adverse action. Id. If the plaintiff produces evidence establishing a prima facie case and evidence that the reasons proffered by the employer for engaging in the adverse action are pretextual, a jury may infer the existence of "but for" causation. Id. at 191-92.

In the present case, Smith has presented only circumstantial evidence of causation. Smith's contention that Michel's and Lee's statements to Smith that she had thirty days to find another job constitute direct evidence of retaliation is in error. Even assuming that Michel and Lee threatened Smith's employment, Smith has not presented any direct evidence linking Michel's and Lee's statements to her report to Corporate Security. Therefore, McDonnell Douglas provides the appropriate framework for an analysis of Smith's claims.

Under the McDonnell Douglas framework, to make out a prima facie claim of retaliation, Smith would have to produce evidence that she engaged in activity protected under the Louisiana whistleblower statute, that an adverse employment action occurred, and that there is a causal link between the protected activity and the adverse action.

Smith argues that the district court's grant of summary judgment was inappropriate because Smith presented sufficient

12

evidence to create a material issue of fact as to whether AT&T was actually reducing its workforce at the time of the alleged retaliatory acts. Smith argues that the district court erred by failing to draw reasonable inferences in her favor regarding her termination and Michel's and Lee's alleged harassment. Specifically, Smith argues that the evidence that other employees received extensions on their FMP expiration periods and that Lee and Michel threatened Smith's job demonstrates that Smith's FMP was pretextual. Smith also contends that the evidence is sufficient to warrant a reasonable inference that Michel and Lee acted with animus towards Smith because of her report to Corporate Security, and that this animus resulted in a delay in Smith's promotion and, ultimately, in Smith's mental breakdown.[4]

AT&T contends that summary judgment is appropriate for three reasons. First, AT&T argues that Smith's allegations do not show that Smith suffered any actionable adverse employment action. Second, AT&T contends that even if Smith alleged an actionable adverse employment action, Smith has failed to demonstrate a causal connection between such action and her report to Corporate Security. Third, AT&T claims that Smith cannot establish she

_____

[4] Smith asserts that causing someone to have a mental breakdown is actionable under section 23:967 because it is similar to a constructive discharge under federal discrimination laws. Because we conclude that Smith has failed to meet her burden on the causation element, we do not address whether such a claim is cognizable under the Louisiana statute.

13

engaged in protected conduct because McBarron's and Pape's personal telephone calls were not made pursuant to an AT&T practice or policy, and the phone calls were covered by AT&T's flat rate arrangement with McDermott and, therefore, they were not illegal.  In addition, AT&T maintains that Smith's "disclosure" to AT&T Corporate Security is not protected under the whistleblower statute because the statute requires disclosure to a third party.

The Court finds that judgment in favor of AT&T was proper because even if Smith's allegations establish that she engaged in protected activity and that an adverse employment action occurred, she has failed to establish a sufficient causal connection between such action and her report to Corporate Security.  Accordingly, the Court need not address the parties' other arguments.

### A.  Smith's Claims of Retaliatory Harassment

Smith alleges that because of her report to Corporate Security, Lee and Michel became hostile and retaliated against her by delaying her promotion, causing her to have a mental breakdown.  Smith's allegations must fail, however, because Smith has failed to meet her burden of establishing a causal connection between Michel's and Lee's allegedly hostile actions and her report.

There are no facts demonstrating a causal connection between

14

Smith's reporting of the telephone calls and the delay in her promotion. Further, Smith has not presented any facts showing that either Michel or Lee had any control over the granting of promotions, nor that Michel or Lee interfered with Smith's efforts to receive a promotion. In fact, the record establishes that Michel assisted Smith in obtaining a promotion by forwarding her request to AT&T's Corporate Office with a favorable recommendation. Further, the record establishes that delay in the approval of Smith's promotion was due to hiring conditions at AT&T Corporation. Moreover, Smith did not experience any actionable prejudice due to the delay because her promotion was approved in July and made retroactive to June. Because Smith has failed to present any facts tending to prove that her promotion was delayed due to her report to Corporate Security, she has failed to establish a prima facie case of retaliation as to this allegation. Therefore, summary judgment in favor of AT&T is appropriate on this claim.

Smith also fails to meet her burden on the causation element as to her claim that Michel and Lee caused her to have a mental breakdown. Smith arguably presents sufficient facts to make out a prima facie case that Michel and Lee acted with animus towards Smith, and that such animus caused Smith's mental breakdown. However, she does not present sufficient evidence to meet her causation burden under the McDonnell Douglas analysis.

Smith has produced facts showing that Michel and Lee treated

15

her with hostility. Smith alleges that Michel raised her voice to Smith, and that both Michel and Lee threatened her job before the FMP was given to her. Smith also claims that Michel sent emails to other AT&T employees, undercutting her reputation. According to Smith, Konningsor told her that he noticed a change in Michel and Lee's behavior towards Smith after she made her report to Corporate Security. As a matter of law, however, Konningsor's observation does not constitute evidence that Smith's report to Corporate Security caused that change in treatment. Nor does Smith's proffered testimony from a clinical social worker, who stated that Smith's medical condition was due to hostile treatment she received at AT&T.

Assuming that the reporting of improper telephone calls constitutes conduct protected by the Louisiana whistleblower statute, and that the alleged instances of hostile conduct which resulted in Smith's mental breakdown constitute a "reprisal" under the statute, Smith's initial burden of proving her prima facie case could be met. However, AT&T produced ample evidence that Michel's and Lee's hostility was due to Smith's continued complaints about her workload and her airing her grievances to Tierney before presenting them to her immediate supervisors, Michel and Lee. Her complaints to fellow employees and to Tierney long predated her report to Corporate Security.

Because AT&T presented evidence of a reason for Michel's and Lee's alleged hostility to Smith that is wholly unrelated to

16

Smith's exercise of a protected activity, the burden shifts to Smith to produce evidence that AT&T's explanation constitutes a pretext, and that Smith's report to Corporate Security is the "but for" cause of Michel's and Lee's actions. Smith fails to meet this burden. First, Smith has produced no evidence that AT&T's proffered explanations are pretextual. The record establishes that Smith's relationship with Michel and Lee was problematic before she made her report to Corporate Security. Second, Smith has produced no evidence that her report was the "but for" cause of Michel's and Lee's actions. Accordingly, as to this allegation, we find that Smith has failed to satisfy her burden of causation under the McDonnell Douglas framework. Therefore, summary judgment is likewise appropriate as to Smith's claim that Michel and Lee harassed Smith due to her report, and that such harassment resulted in her mental breakdown.

**B.    Smith's Claim of Retaliatory Dismissal**

Smith also argues that her dismissal from AT&T resulted from her report to Corporate Security. Under the plain terms of the Louisiana statute, discharge constitutes reprisal. However, Smith's allegations are insufficient to withstand summary judgment because she has not presented sufficient facts to establish a prima facie case on the causation element. There is no evidence in the record to support Smith's contention that Michel's and Lee's anger towards Smith caused Smith's discharge.

17

The record confirms that Smith's position was eliminated, along with many others, as part of a reduction in force unrelated to Smith's activity. While Smith has raised a fact issue over whether Michel and Lee acted with animus towards Smith, Smith does not present any facts indicating that Lee and Smith had any control over Smith's discharge.[5] The record establishes that Smith's position was terminated because McDermott decided to transfer certain functions in-house.

Smith was discharged under the FMP after she was unable to find alternative employment within AT&T. Smith contends that other employees who received FMPs were granted extensions beyond the sixty-day expiration period, and suggests she was denied an extension in retaliation for her report to Corporate Security. While the record demonstrates that some other employees who received FMPs were given an extension, the record does not show that this treatment was causally related to Smith's report. Due to her claim of disability, Smith began her sixty-day FMP period many months after the other employees involved in the workforce reduction. Accordingly, her situation was substantially different from that of the other employees. Second, and most importantly, Smith has not demonstrated that Michel or Lee had

---

[5] While Smith alleges that Michel and Lee told her in mid-September that she had thirty days to find a new job, the record does not show that Michel and Lee were involved with the decision to discharge Smith or to transfer the training function back to McDermott.

any control over the length of Smith's FMP, nor has she demonstrated that whoever did have control failed to grant her an extension in retaliation for her report to Corporate Security.

Smith does not directly argue, but speculates, that part of the reason she was unable to locate alternative employment was because of the negative performance appraisal Michel drafted and Michel's alleged tampering with Smith's computer data. However, there is no evidence of a causal connection between her dismissal and the negative appraisal and/or the alleged computer tampering. First, the record shows that Michel's negative reviews were contained in a draft that was never placed in Smith's personnel file. There is no evidence that this draft was circulated beyond Tierney, who changed it. Second, Smith has not provided any evidence that hiring managers contacted Michel about Smith during Smith's FMP period, nor that Michel provided a negative review of Smith to any such hiring managers.

Because Smith has failed to make out a <u>prima facie</u> case that her dismissal was due to a retaliatory motive on the part of AT&T, we find that summary judgment was appropriate as to Smith's claim that she was discharged as a result of her report to Corporate Security.

### IV. <u>CONCLUSION</u>

For the foregoing reasons, the judgment of the district court is AFFIRMED.

19